UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
JOHN T. BROPHY,

                                        Plaintiff,

            - against -

ELAINE L. CHAO, as Secretary, U.S.
Department of Transportation, and
JOHN AND JANE DOES 1-10,

                                        Defendants.
--------------------------------------------------------------x

**OPINION & ORDER**

No. 17-CV-9527 (CS)

<u>Appearances</u>

Philip J. Smallman
Brooklyn, New York
*Counsel for Plaintiff*

Allison M. Rovner
Assistant United States Attorney
New York, New York
*Counsel for Defendant*

<u>Seibel, J.</u>

        Before the Court is the motion for summary judgment of Defendant Elaine L. Chao, as

Secretary of the U.S. Department of Transportation (the "DOT").  (Doc. 44.)  For the reasons

discussed below, Defendant's motion is GRANTED.

## I.   **BACKGROUND**

The following facts are based on Defendant's Local Civil Rule 56.1 Statement, (Doc. 46

("D's 56.1")), and Plaintiff's responsive 56.1 Statement, (Doc. 54 ("P's. 56.1 Resp.")), and are

undisputed unless otherwise noted.[1]

### A.   **Facts**

In July 2013, the FAA, part of the DOT, posted a vacancy for the position of Manager in

the Labor Employee Relations ("LER") Branch in the Eastern Region in Jamaica, New York.

---

[1] Plaintiff's responsive 56.1 Statement fails to comply with the Federal Rules of Civil Procedure, the Local Rules, and my Individual Practices. It includes responses to only some of the entries in Defendant's 56.1 Statement and does not comply with item 2.C.i of my Individual Practices, which requires the opposing party to reproduce each entry in the moving party's Rule 56.1 Statement before setting out its response thereto. Plaintiff's failure to reproduce each paragraph of the moving party's Rule 56.1 Statement defeats the purpose of my individual practice, which is designed to prevent the Court from having to go back and forth between the two Rule 56.1 Statements. In addition, Plaintiff set forth his Local Rule 56.1(b) counter-statements but did not, as required by Local Rule 56.1(d), cite to evidence for them. Further, he set out his counter-statements before his responses to Defendant's statements, and thus duplicated the numbering of the two statements. Any citation herein to "P's 56.1 Resp. ¶ _" corresponds to the numbered paragraphs starting near the bottom of page two of the document. Plaintiff attached an exhibit to the end his 56.1 Statement, which he referred to as a "Human Resources Personnel Manual" and is referred to herein as "HRPM."

Finally, in Plaintiff's responsive 56.1 Statement, he cites to "*ROI, Ex.* [X]" throughout, without an explanation of what these exhibits are and without attaching them to the papers he filed in opposition to this motion. (*See* P's 56.1 Resp. at 2-4.) As a footer on every page of his brief, Plaintiff states, "ROI refers to FAA Report of Investigation, Complaint. No. 2014-25422-FAA-03," but he did not provide that report in connection with this motion. On July 5, 2018, while Plaintiff was *pro se* and more than a year before briefing on the instant motion, Plaintiff filed what he described as an Appendix to his Amendment Complaint, which included a Federal Aviation Administration ("FAA") "Report of Investigation" and attached exhibits. (Doc. 16.) The Court assumes Plaintiff meant to cite to those records in his responsive 56.1 Statement and opposition brief, but he still made two errors. First, he did not submit that appendix pursuant to a declaration, and thus there is nothing in the record regarding its authenticity. Second, Plaintiff in some instances cited to documents that are many pages long without providing a pinpoint citation, which is entirely unhelpful for the Court, and, more critically, means that the facts offered need not be accepted as true. *See Patacca v. CSC Holdings, LLC*, No. 16-CV-679, 2019 WL 1676001, at *17 (E.D.N.Y. Apr. 17, 2019) ("[I]t is not the role of the Court to search the summary judgment record for evidence supporting a nonmovant's opposition."). The Court will

(D's 56.1 ¶ 1; Doc. 48 ("Malon Decl.") Ex. A ("Job Announcement").)  The duties of the job included, among other things, assigning and reviewing work, taking disciplinary action, hiring and promoting, assuring proper implementation of policies and procedures, advising regarding complex labor- and employee-relations issues, and performing functions that could "impact" customer service and relationships with employees.  (D's 56.1 ¶ 2; Job Announcement at DOT_00552.)  Applicants had to be U.S. citizens and possess at least one year of specialized experience "equivalent to FV-1 or FG/GS-13 in the Federal Service," which includes but is not limited to experience "in interpreting and applying labor and employee relations principles" and "in evaluating complex [labor relations/employee relations] issues and recommending solutions." (Job Announcement at DOT_00552.)  The Job Announcement listed "Evaluation Criteria," also known as "Knowledge, Skills, and Ability," or "KSA," which included four "Leadership and Management Dimensions," as well as three "Technical Requirements."  (*Id.* at DOT_00552-53; D's 56.1 ¶ 4.)  The Leadership and Management Dimensions were:

> 1.  Managerial Selection Factor 1:  Ability to Achieve Results – Successful managers promote a sense of individual responsibility, professionalism and pride for organizational performance.  They set clear individual and unit or organizational performance objectives.  They adjust the way work is performed to meet changing conditions and demands.  They hold individuals accountable for achieving their performance objectives; and, they recognize and reward high performance.  They take into account a variety of complex factors; and, they stay alert to changing customer needs and challenges.  They evaluate business successes and failures and apply lessons learned.
>
> 2.  Managerial Selection Factor 2:  Ability to Lead People – Successful managers create an environment in which people thrive and accomplish their best.  They use teamwork effectively to achieve business results.  They ensure equal opportunity for all employees or applicants through compliance with applicable [Equal Employment Opportunity] laws and regulations.  They capitalize on the full range of talent to enhance team performance; and, they provide feedback to employees to

---

review those documents to the extent Plaintiff cites to them, but there are ways to create a record on summary judgment, and this is not one of them.

support their development.  They consider the future talent needs of the unit or organization and implement appropriate workforce planning.

3.  Managerial Selection Factor 3:  Skill in Building Relationships – Successful managers communicate openly and honestly.  They pay attention and communicate understanding.  They foster open communication and exchange of ideas and knowledge.  They consistently treat others with respect; and, they handle emotionally charged or controversial issues responsibly.  They work collaboratively to resource and achieve critical priorities.  They present viewpoints with courage and conviction; and, they make tough decisions and stand behind them.

4.  Managerial Selection Factor 4:  Ability to Lead Change – Successful managers build a shared vision with others across their organization.  They plan for changing trends that can affect operations.  They will change viewpoints, behavior and work methods in response to new information.  They anticipate barriers and resistance to change and seek solutions.  They recover quickly from setbacks; and, they handle complex or ambiguous situations effectively.  They demonstrate a positive attitude to achieving results.

(Job Announcement at DOT_00552-53.)  The technical requirements were:

1.  Ability to communicate with peers, subordinates, customers and unions to resolve difficult and complex issues by acquiring, clarifying, or exchanging facts or information needed to make sound and logical decisions based on Federal Personnel laws, principles, policies, negotiated agreements, methods, and practices.

2.  Ability to influence, persuade, and collaborate resolutions on controversial issues/matters related to Labor and Employee Relations.

3.  Ability to establish criteria, develop and implement new techniques utilizing innovative approaches and creative methods for program implementation and evaluation requiring a substantial depth of research and analysis.

(*Id.* at DOT_00553.)

The Job Announcement stated applicants were "NOT required to provide a narrative response in the text box listed below each KSA," and "[i]n lieu of providing a KSA narrative response . . . , in your work history, please include information that provides specific examples

4

of how you meet the response lever or answer you chose for each KSA."  (*Id.*)[2]  The Job

Announcement also stated that "[s]ome, all or none of the candidates may be interviewed."  (*Id.*

at DOT_00552.)

The FAA's "HR Services Group" assessed the applications and deemed six individuals to

be qualified for the position.  (D's 56.1 ¶ 31.)  They included Plaintiff, a seventy-three-year-old

white male; Juan Restrepo, a thirty-nine-year-old Hispanic male; and Sandra Peets, a forty-eight-

year-old black female.  (*Id.* ¶¶ 6, 13, 22.)[3]

Plaintiff received a "BA from Pace College, a JD from Pace University, and 30 credits

towards [an] MS at American University."  (*Id* ¶ 7.)  While getting his J.D., Plaintiff

"major[ed] . . . in Employment and Labor Law."  (Malon Decl. Ex. C ("P's App.") at

DOT_00604-05.)  Plaintiff was employed by the U.S. Marshals Service from 1964 to 1983, by

the U.S. Department of Agriculture Inspector General's Office from 1983 to 1984, as a law firm

investigator and law clerk from 1984 to 1998, and as a private investigator from 1998 to 2006.

(D's 56.1 ¶ 12.)  He also spent four years in the U.S. Marine Corps.  (P's App. at DOT_00597.)

---

[2] Indeed, the announcement described the FAA's "commit[ment] to eliminating the use of the [KSA] narratives from the initial application" as part of an initiative to "streamlin[e] the hiring process."  (Job Announcement at DOT_00553.)

[3] In Plaintiff's responsive 56.1 Statement, he states that the FAA's HR Service Group "rated the pay grade level experience, education and training of the applicants," and found that Plaintiff and Peter Grossi, "both white applicants over 40 were rated Highest Grade Qualification (HGQ) FV-K," while "Peets and Restrepo were rated at the FV-J levels."  (P's 56.1 Resp. ¶ 31.) In doing so, Plaintiff cites to "*ROI, Ex. F7 d.*"  "Exhibit F7d" that Plaintiff filed, (Doc. 16 at 167-73), lists "HGQ" scores for applicants, but the documents are mostly illegible, and the Court cannot make out the applicants to which the documents are referring, so there is no way for the Court to know whether Plaintiff's statement is true.  Further, the Court cannot tell if this rating refers to the highest pay or other level the applicants had achieved, their qualifications for the particular position at hand, or something else.  In any event, it is undisputed that all six candidates were qualified for the position.  For purposes of this motion, Plaintiff's response is not accepted as true, but even if it were, it would not change the outcome of this Opinion.

In February 2006, Plaintiff was hired by the FAA, where he served as an "LER Specialist in the Eastern Region."  (D's 56.1 ¶ 8.)[4]

Restrepo received a "BA in criminal justice from John Jay College of Criminal Justice and [an] MS from Baruch School of Business in Industrial and Labor Relations."  (*Id.* ¶ 21.) From 1994 to 1999, he  was an "operations supervisor for United Parcel Service ("UPS"), where he was responsible for 30 teamster bargaining employees, delegated assignments, evaluated employee performance, took disciplinary action, and represented management."  (*Id.* ¶ 19.)[5] From 2000 to 2005, Restrepo was a "Shop Steward" for the Communication Workers of America ("CWA"), and from 2005 to 2007, he was "Chief Union Steward," (Doc. 50 ("Restrepo Decl.") Ex. A ("Restrepo App.") at DOT_00658), a position in which "he was responsible for a team of six shop stewards covering Verizon union employees, represented CWA at hearings, delegated tasks, trained shop stewards, and administered settlement agreements on behalf of CWA," (D's 56.1 ¶ 17).  From 2007 to 2008, Restrepo was a "labor standards investigator, enforcing state labor regulations" for the New York State Department of Labor.  (*Id.* ¶ 16.)  In

---

[4] In Plaintiff's responsive 56.1 Statement, he states that he had sixteen months of leadership experience as a "supervisory criminal investigator while employed with USDA Office of Inspector General," and he cites to "*ROI, Ex. 8a*" to support the assertion.  (P's 56.1 Resp. ¶ 11.)  The Court understands that Plaintiff attempted to cite to his job application, but he did not provide a pinpoint citation, and a review of the document by this Court did not reveal that fact. Plaintiff testified at his deposition that he supervised criminal investigators in that job, (Doc. 47 ("Rovner Decl.") Ex. B ("P's Dep. Tr.") at 14:6-19), so it is accepted as true for purposes of this motion.  But Plaintiff's counsel disserves his client if he "expects the Court to scour the record," *MS Elmsford Snack Mart, Inc. v. Weil*, No. 14-CV-2226, 2018 WL 1281829, at *8 (S.D.N.Y. Mar. 5, 2018), for the facts on which he relies.

[5] Plaintiff disputes this statement, arguing that Defendant cannot establish this fact based on Restrepo's statement alone.  But Restrepo was consistent about his experience in his affidavit, deposition, and initial employment application, and Plaintiff's naked denial is insufficient to establish a dispute of fact on this motion.

May 2008, Restrepo was hired by the FAA as an LER Specialist in the Eastern Region, the same

job Plaintiff held.  (*Id.* ¶ 14.)

Peets is a high school graduate who attended college for two years but did not get a

degree.  (*Id.* ¶ 30.)  From 1985 to 1990, Peets was a letter-sorting machine operator at the United

State Postal Service (the "USPS"), and from 1990 to 1996, Peets was a general clerk for the

USPS, where she handled labor disputes and disciplinary actions.  (*Id.* ¶¶ 28-29.)  From 1998 to

2003, Peets was a "labor relations specialist" for the USPS, "where she supervised a portion of

the office's employees, provided guidance to supervisors concerning attendance and disciplinary

matters, handled grievances, arbitrations, and unemployment hearings, achieved an over 80

percent win rate in arbitrations, and served as Acting Manager."  (*Id.* ¶ 27.)  From 2003 to 2010,

Peets was an "area labor relations specialist" for the USPS.  (*Id.* ¶ 26.)  In November 2010, she

was hired as an LER Specialist in the Eastern Region.  (*Id.* ¶ 23.)

The FAA's HR Services Group sent the six applications – including Plaintiff's,

Restrepo's, and Peets's – to the selecting official ("SO"), Scott Malon.  (*Id.* ¶ 31.)  Malon, a

white male, was the "Eastern Service Area Manager," and at the relevant time, he was forty-six

years old.  (*Id.* ¶¶ 32, 34.)  Malon reviewed the six applications and testified that all six

candidates "were impressive in their own way with different skills sets, different things they

brought to the table."  (Rovner Decl. Ex. A ("Malon Dep. Tr.") at 24:11-13.)

After Malon received the applications, "the next step was the interview," (*id.* at 20:21-

23), which Malon attested had always been intended to be weighted heavily in determining who

would be offered the position, (Malon Decl. ¶ 9).  Malon drafted ten interview questions based

on "samples of previous questions available within the FAA that were representative of the

qualities [he] was seeking in a Branch manager."  (*Id.* ¶ 10; *see* D's 56.1 ¶ 39.)  The ten

questions were as follows:

> 1.   Please describe your background and experience in labor and employee relations, as well as any experience supervising employees and managing organizations.
>
> 2.   Describe your leadership style.  Please give examples which demonstrate this leadership style.
>
> 3.   In transitioning from an L/ER Specialist to a Branch Manager, how would you motivate a diverse LR staff to achieve regional and national goals?  Do you foresee any issues with this transition?
>
> 4.   What do you see as the biggest challenges facing the FAA's LER organization as a whole, and specific to the AEA L/ER branch?
>
> 5.   Explain what you would do in the position in the first 90 days and what would you prioritize?
>
> 6.   Describe what quality customer service means to you and give examples of how you have provided this service to others.
>
> 7.   Describe how you would prioritize the real, but competing needs of serviced organizations with the reality of limited resources.  Give an example of how you resolved a problem of competing priorities.  (Achieving Results)
>
> 8.   Describe a situation where you influenced another person to make positive changes in their performance or behavior.  How did you approach them?  What was their reaction?
>
> 9.   Describe one of the most stressful situations you have encountered in your career where the situation required immediate action.  (Adaptability)
>
> - What was the situation?
> - What were your decisions?
> - What was the result?
>
> 10.   Describe a time when you relayed a tough decision that supported organizational goals/programs but was not seen by your customers as being in their best interest.  (Conflict Resolution)
>
> - How did you explain the decision?
> - How did you customers respond?
> - What did you do to bring the customers on-board?

(Malon Decl. Ex. D ("Malon Interview Notes") at DOT_00672-76.)  On six of the ten questions, Malon listed "Positive Indicators," identifying the answers he was looking for a good candidate to provide.  (*Id.*)  Malon also devised a system to score an applicant's response to each question: an applicant received a score of "1" if "the response was non-responsive or minimally responsive to a question, did not give an example, or was not meaningful"; a "2" if "the response was satisfactory but did not have the value added of a response scoring a three"; and a "3" if "the applicant's answer was fully responsive to the question."  (*Id.*; D's 56.1 ¶ 43.)

Malon recruited Tesha McMinn, the "Central Service Area Manager," and Irma Field, the "Human Resources Specialist, LER, with the Office of LER, Regional Operations," to be on the interview panel with him.  (D's 56.1 ¶¶ 44-46.)  McMinn, a black female, was forty-four years old at the time of the interviews, and Field, who self-identifies as a white female,[6] was fifty-six years old at the time of the interviews.  (*Id.* ¶¶ 45-46.)

Malon, McMinn, and Field interviewed each candidate for one hour, giving them approximately six minutes to answer each question.  (*See id.* ¶ 48.)  Each of the interviewers took

---

[6] Defendant states in her 56.1 Statement that Field is either white or American Samoan, (D's 56.1 ¶ 46), but Field self-identifies as white, (Rovner Decl. Ex. E at DOT_00521).  Plaintiff disputes this fact and says that Field self-identifies as "Bolivian."  (P's 56.1 Resp. ¶ 46.)  Plaintiff cites to "*ROI, Ex. F.4*" for this proposition, which left the court to comb a multi-page document to determine to what Plaintiff was citing.  But Exhibit F4 is McMinn's affidavit submitted to an Equal Employment Opportunity ("EEO") investigator, not Field's.  That said, Exhibit F3 is Field's affidavit to the EEO investigator, and attached to that document is an email Field sent to an individual named "Carmen Webb," in which Field said her "national origin" is "Bolivian."  (Rovner Decl. Ex. E at DOT_00526.)  But this email does not create a factual dispute regarding Field's race.  Plaintiff has offered no evidence to suggest that Field was anything other than white, as she self-identified, and that her "national origin" is "Bolivian" does not mean she is not white.  Race and national origin are not the same thing.  The Court thus accepts as true for purposes of this motion that Field is white.  Again, the Court notes Plaintiff's papers fall far short of what the Court expects.

notes during the interview, (*id.* ¶ 49),[7] and after the conclusion of each interview, Malon,

McMinn, and Field conferred and scored the applicant's answers (on the 1-to-3 scale explained

above), (*id.* ¶ 50). After all six interviews were completed, Restrepo had the highest score with

twenty-two points, Peets had the second highest with twenty points, and Plaintiff tied for the

lowest score with fifteen points. (*Id.* ¶¶ 51, 54, 59.) A breakdown of how those three applicants

scored on each question is provided in a summary matrix that Malon prepared after all of the

interviews were completed and scored. (Malon Decl. Ex. F.)

All interviewers agreed that Restrepo's performance was the best of all the candidates, in

that his responses were customer-service oriented and skillful, and he was articulate and

charismatic. (*See* D's 56.1 ¶¶ 51-52.) McMinn found that Peets did "exceptionally well" during

the interview, (McMinn Decl. ¶ 9; *see* D's 56.1 ¶ 56), and Malon testified that he believed that

"Peets'[s] responses to the interview questions demonstrated the customer-service focus that he

was seeking, her answers to questions were articulated clearly and substantively on point, and

she demonstrated a soft, or calm, approach to gathering facts and understanding the situation, but

also conveyed an ability to take action," (D's 56.1 ¶ 55). All three interviewers believed that

Plaintiff did not perform as well in the interview as Restrepo or Peets. (Malon Decl. ¶ 21;

McMinn Decl. ¶ 10; Rovner Decl. Ex. E at DOT_00524.) First, Malon and McMinn found that

---

[7] Plaintiff disputes this fact by stating, "There is no copy of McMinn's contemporaneous notes in the FAA Report of Investigation." (P's 56.1 Resp. ¶ 47 (citing "*ROI, Ex. F7*").) But first, it does not matter whether the notes were part of the FAA's investigation's records, as they are part of the record before this Court. (Doc. 49 ("McMinn Decl.") Ex. A.) And second, the notes were part of that record, which Plaintiff should know as he filed the FAA's "Report of Investigation" and attached exhibits as an "Appendix" to his Amended Complaint, (*see* Doc. 16 at 200-05 (using the page numbers generated by the Court's Electronic Case Filing System); Doc. 16-1 at 1-5 (same)), and there is nothing in evidence to dispute McMinn's assertion that the notes were taken contemporaneously with the interview, (McMinn Decl. ¶ 6), other than Plaintiff's bald assertion to that end.

Plaintiff's answer to the interview questions did not align with the FAA's "customer service philosophy."  (D's 56.1 ¶ 60; Malon Decl. ¶ 21; *see* McMinn Decl. ¶ 10.)[8]  Indeed, all three interviewers noted that Plaintiff advocated telling customers "'no'" and explaining why certain things could not be done.  (D's 56.1 ¶ 61.)  Second, the interviewers noted that Plaintiff was "negative" during his interview.  (Malon Decl. Ex. F (Malon noted Plaintiff was "negative throughout"); Rovner Ex. E at DOT_00524 (Field described Plaintiff focused on identifying problems but not on providing solutions); McMinn Decl. Ex B at DOT_00531 (McMinn explaining Plaintiff's answers "were negative in tone").[9]  The interviewers were also troubled by Plaintiff's statement during the interview that he would "'take names and kick ass'" if promoted, (D's 56.1 ¶ 62), which Plaintiff said in answering a question about his leadership style, (*id.*; P's Dep. Tr. at 59:10-17).

After conducting and scoring the interviews, Malon first selected Restrepo for the position, but Restrepo declined the job offer because he decided to take another job outside of the FAA.  (D's 56.1 ¶ 53.)  Malon then offered the job to Peets, who accepted.  (*Id.* ¶ 54.)

---

[8] Plaintiff disputes that Malon and McMinn believed that his answers to the interview questions did not align with the FAA's customer-service philosophy.  (P's 56.1 Resp. ¶ 60.)  But in doing so, he cites to a non-existent document, "*ROI Ex. 7f-h.*"  The Court's best guess is that he meant to cite to Ex. F7f-h, which are the three interviewers' notes.  (Doc. 16 at 176-205; Doc. 16-1 at 1-5.)  If those documents are what Plaintiff meant to cite, the Court does not know which line(s) of the thirty-four pages he believes supports his point.  Further still, Defendant has identified portions of those notes that support her assertion regarding Malon's and McMinn's impression of Plaintiff, (*see, e.g.*, Malon Decl. Ex. D at DOT_00679 (noting Plaintiff's philosophy that "You can always say 'No'")), and Plaintiff's assertion to the contrary, without specifically pointing to evidence to support that assertion, is rejected.

[9] Plaintiff disputes that he was "negative" during his interview, but offers no cogent support for that dispute (again, citing to numerous pages of the FAA investigative record without providing any explanation as to what in those pages supports his proposition), so the Court accepts as true that he was negative during his interview.  And, in any event, Plaintiff does not dispute that the interviewers perceived him to be negative during the interview.

On March 20, 2014, Plaintiff filed a complaint of employment discrimination with the DOT.  (Rovner Decl. Ex. F.)  The FAA conducted an investigation, and on September 23, 2015, an administrative law judge with the Equal Employment Opportunity Commission ("EEOC") granted summary judgment in favor of the DOT on Plaintiff's claims.  (*Id.* Ex. H.)

### B.    Procedural History

On December 5, 2017, Plaintiff filed his *pro se* Complaint against Defendant, John and Jane Does 1-10, and the FAA, (Doc. 1), and on June 8, 2018, Plaintiff amended and dropped the FAA as a defendant, (Doc. 14).  On July 6, 2018, Defendant filed a motion to dismiss, and on February 7, 2019, the Court granted the motion in part and denied it in part, leaving only Plaintiff's claims of race discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, *et seq.*, and age discrimination under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621, *et seq.*  (Doc. 26 at 15.)  The Court noted in its opinion that "it is likely that Defendant will prevail on a summary judgment motion with regard to Plaintiff's racial and age discrimination claims" because "Plaintiff has already done the work for Defendant by pleading a legitimate nondiscriminatory reason for her failure to promote him, and Plaintiff will now carry the burden of having to show that reason was pretextual, despite the AC offering no hint of any pretext."  (*Id.* at 12.)

At a March 7, 2019 conference, counsel appeared for Plaintiff, (Minute Entry dated Mar. 7, 2019), and counsel filed a notice of appearance on March 13, (Doc. 30).  Prior to that point, Plaintiff had litigated the case *pro se*.

Defendant answered Plaintiff's Amended Complaint on March 22, (Doc. 31), and after the parties engaged in discovery, Defendant filed a pre-motion letter, (Doc. 38), and the Court held a pre-motion conference, (Minute Entry dated Oct. 16, 2019).  On February 21, 2020, the

parties filed their motion papers, including Defendant's memorandum of law, (Doc. 45 ("D's Mem."), Plaintiff's opposition, (Doc. 54 ("P's Opp.")), and Defendant's reply, (Doc. 52 ("D's Reply")).

## II.   <u>LEGAL STANDARD</u>

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law . . . .  Factual disputes that are irrelevant or unnecessary will not be counted."  *Id.*  On a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.

The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to "present evidence sufficient to satisfy every element of the claim."  *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008).  "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]."  *Anderson*, 477 U.S. at 252.  Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks omitted).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1).  Where an affidavit is used to support or oppose the motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated." *Id.* 56(c)(4); *see Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008).  In the event that "a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it."  Fed. R. Civ. P. 56(e).

## III.   <u>DISCUSSION</u>

Claims of discrimination under Title VII and the ADEA for failure to promote are analyzed using the familiar burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 136 (2d Cir. 2016).  First, a plaintiff must demonstrate "(1) she was within the protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination." *Naumovski v. Norris*, 934 F.3d 200, 214 n. 39 (2d Cir. 2019) (internal quotation marks omitted); *see Coger v. Conn. Dep't of Pub. Safety*, 143 F. App'x 372, 374 (2d Cir. 2005) (summary order) (plaintiff must establish a *prima facie* case that "(1) he is a member of a protected class; (2) he was qualified for the position for which he applied; (3) he was denied the

job; and (4) the denial occurred under circumstances giving rise to an inference of discrimination on a basis forbidden by [statute].").

Once a *prima facie* case is established, a "rebuttable presumption of discrimination arises" and the burden of production shifts to the defendant "to articulate a legitimate, non-discriminatory reason" for the adverse employment action. *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 134 (2d Cir. 2000). Once the defendant proffers a legitimate, non-discriminatory reason, the presumption drops away, and the plaintiff must prove that the reason offered by the defendant was not its true reason but rather a pretext for unlawful discrimination. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000); *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 168 (2d Cir. 2001); *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 91 (2d Cir. 2001), *as amended* (June 6, 2001). The plaintiff must produce "sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) (alterations and internal quotation marks omitted). The ultimate burden of persuasion remains with the plaintiff to show that the defendant intentionally discriminated. *Reeves*, 530 U.S. at 143.

"The burden of establishing a *prima facie* case is not onerous, and has been frequently described as minimal," *Walsh v. N.Y.C. Hous. Auth.*, 828 F.3d 70, 75 (2d Cir. 2016) (internal quotation marks omitted), and thus there are circumstances in which a court will presume a plaintiff has established a *prima facie* case and proceed directly to the second or third step of *McDonnell Douglas*, *see id.* at 75-76 ("In part because [plaintiff's] burden at the *prima facie* stage is minimal, and because [plaintiff] does not argue that [defendant] failed to proffer a legitimate, nondiscriminatory explanation for its adverse employment action, . . . [w]e thus

proceed directly to the third step of the *McDonnell Douglas* analysis . . . ."); *Terpstra v. Shoprite Supermarket, Inc.*, No. 17-CV-6840, 2019 WL 3338267, at *5 (S.D.N.Y. July 25, 2019) (collecting cases), *appeal dismissed*, No. 19-2570 (2d Cir. Dec. 2, 2019).  "This is because a plaintiff who can prevail at the third stage of the *McDonnell Douglas* process has necessarily demonstrated circumstances giving rise to an inference of discrimination, and a plaintiff who cannot prevail at the third stage cannot prevail on his/her claim whether or not there exist circumstances giving rise to an inference of discrimination."  *Johnson v. Ultravolt, Inc.*, No. 13-CV-3518, 2015 WL 541519, at *4 (E.D.N.Y. Feb. 10, 2015).  Accordingly, to "avoid redundancy" between the first and third stages of the *McDonnell Douglas* test, *id.* at *4, the Court will assume plaintiff has established a *prima facie case* and move directly to the second and third stages of the *McDonnell Douglas* analysis.

### A.    Defendant's Proffered Reason for the Adverse Employment Action

Defendant argues that "[t]he undisputed facts show that [Plaintiff] was not selected for the Branch Manager position based on the legitimate non-discriminatory reason that he did not perform as well as Restrepo and Peets when interviewed."  (D's Mem. at 16.)  Plaintiff argues that this proffered reason is not legitimate.  (P's Opp. at 18-24.)  Specifically, Plaintiff argues that (1) Malon and the interviewers used subjective evaluation criteria in analyzing the applicants to hide their discriminatory animus and (2) their decision to disregard Peets's lack of narrative responses in her written application and to focus on "superfluous" interview questions render the interview process illegitimate.  (*Id.*)[10]  Both argument arguments are rejected.

---

[10] In the same section of his brief, Plaintiff also argues that Defendant's justification for not hiring Plaintiff, and for offering the position to Restrepo and Peets, changed over time, further suggesting the presence of discrimination.  (P's Opp. at 20-22.)  But allegations that an employer's justification shifted over time go to pretext, not whether the proffered justification

"An employer's 'explanation of its reasons'" for its hiring decision "'must be clear and specific' in order to 'afford the employee a full and fair opportunity to demonstrate pretext.'" *Smith v. N. Shore-Long Island Jewish Health Sys.*, 286 F. Supp. 3d 501, 519 (E.D.N.Y. 2018) (quoting *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 103 (2d Cir. 2001), *superseded in part and on other grounds* by Fed. R. Civ. P. 37(e)). "Where an employer's explanation, offered in clear and specific terms, is reasonably attributable to an honest even though partially subjective evaluation of qualifications, no inference of discrimination can be drawn." *Id.* (internal quotation marks omitted). "At the same time," however, "an employer may not use wholly subjective and unarticulated standards to judge employee performance for purposes of promotion. This is because any defendant can respond to a discrimination charge with a claim of some subjective preference or prerogative and, if such assertions are accepted, prevail in virtually every case." *Sibilla v. Follett Corp.*, No. 10-CV-1457, 2012 WL 1077655, at *15 (E.D.N.Y. Mar. 30, 2012) (internal quotation marks, citation, and alterations omitted).

Plaintiff argues that the interview questions that the interviewers used were "subjective, unarticulated, and subject to manipulation," and thus cannot be considered the basis of a legitimate employment decision. (P's Opp. at 19.) But Malon prepared ten detailed questions, which, by the Plaintiff's own admission, were asking for the same kind of information as the written application. (*See id.*) Indeed, a review of the questions shows that they were tailored to obtain information that goes directly to the seven KSA. (*Compare, e.g.*, (Job Announcement at DOT_00552 (describing appropriate leadership style), *with* Malon Interview Notes at DOT_00672 (asking about leadership style).) Further, Malon developed a scoring system for his

---

was legitimate. *See, e.g.*, *EEOC v. Ethan Allen, Inc.*, 44 F.3d 116, 120 (2d Cir. 1994) (collecting cases). Accordingly, the Court addresses this argument in its analysis of the third prong of the *McDonnell Douglas* test below.

interview questions, and each interviewer took detailed notes during the interviews justifying

their scores.  The Court can hardly think of a more articulated and objective way to develop,

administer, and score an interview than what the interviewers did here, and far less objective and

articulated interview procedures have been found sufficient.  *See Dunaway v. MPCC Corp.*, No.

12-CV-7609, 2015 WL 4429276, at *6 (S.D.N.Y. July 16, 2015) (interviewer's determination

that "Plaintiff's communication style and demeanor were ill-suited" for employer was

sufficiently articulated), *aff'd*, 669 F. App'x 21 (2d Cir. 2016) (summary order); *see also Pasha*

*v. William M. Mercer Consulting, Inc.*., No. 00-CV-8362, 2004 WL 188077, at *9 (S.D.N.Y.

Feb. 2, 2004) (defendant's employees' evaluations of the plaintiff's "fit" and communication

skills based on interview were legitimate, nondiscriminatory reasons for failure to hire), *aff'd sub*

*nom. Pasha v. William M. Mercer Inv. Consulting, Inc.*, 135 F. App'x 489 (2d Cir. 2005)

(summary order).  If Plaintiff's argument were accepted here, the Court could think of essentially

no interview that would be sufficiently objective or articulated, and it simply is not the case that

candidates' interview performances cannot form the basis of a legitimate, non-discriminatory

employment decision.  Of course, some subjective evaluation will be part of interviews, but as

noted, where an employer can explain the employment decision in clear and specific terms, such

subjectivity does not render the employer's proffered justification illegitimate.  *See Smith*, 286 F.

Supp. 3d at 519.

Further still, as noted above, the reason employers are required to provide clear and

specific reasons for their promotion decisions is so that employees can have a full and fair

opportunity to establish whether that stated reason was a pretext for discrimination.  *See Tex.*

*Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 258 (1981).  Here, Defendant has clearly stated

the reason that Plaintiff was not selected for the position, while Restrepo and Peets were:

Plaintiff did not perform as well on the interview.  Additionally, based on the scoring system and their notes, the interviewers found that Plaintiff did not share the FAA's customer-service philosophy as he was overly negative and too quickly went to "no."  (*See* Malon Decl. ¶ 21 (Plaintiff did not have the correct customer-service philosophy); McMinn Decl. ¶ 10 (all panelists agreed Peets performed better than Plaintiff); Rovner Decl. Ex. E at DOT_00524 (Field described Plaintiff focused on identifying problems but not on providing solutions); Malon Decl. Ex. F (describing Plaintiff's attitude as "negativ[e]"); McMinn Decl. Ex B at DOT_00531 (describing Plaintiff's tone as "negative").)  Accordingly, Plaintiff has notice and a clear explanation as to Defendant's proffered legitimate and nondiscriminatory justification for the promotion decision, which Plaintiff had the opportunity to (and which he did) argue was pretextual.[11]

Finally, Plaintiff argues that Defendant's reason for offering the Branch Manager position to Restrepo and Peets was illegitimate because Peets did not provide narrative answers to the KSAs and because the interview questions were superfluous.  (*See* P's Opp. at 22-24.)  But this

---

[11] Plaintiff also argues that the interview questions did not comply with "FAA Human Resources Personnel Manual (HRPM 1.14(4) [*sic*])," which, according to Plaintiff, "requires that persons on promotion panels 'assess the qualified applicants against the criteria in the job announcement, in the applicants' on-line applications and in the applicants' resumes.'" (P's Opp. at 19.)  As noted, attached to Plaintiff's responsive 56.1 Statement is section "1.14" of the FAA's "Human Resources Policy Manual (HRPM)," (HRPM), but the language Plaintiff "quoted" from the HRPM is not there.  Rather, the HRPM states that candidates are to be assessed against the KSA, but also that the selecting official is to "[d]evelop[] criteria against which eligible applicants will be evaluated," and "[a]ssess[] qualified applicants against the criteria."  (HRPM § 1.14(4)(b), (d).)  That is precisely what Malon did here.  Further, section 2 of the HRPM states that selecting officials have "[c]onsiderable latitude . . . to supplement the broad guidance in this document to ensure that the program affords appointing authorities flexibility to manage their own promotion programs."  (*Id.* § 2.)  Accordingly, Plaintiff has not established any material fact issue regarding whether Malon's selection process violated the HRPM, let alone whether any such deviation would cast doubt on the legitimacy of the stated reasons for selecting Restrepo and Peets over Plaintiff.

argument too is rejected.  Neither Peets nor any applicant was required to provide narrative

responses to the KSA questions.  (Job Announcement at DOT-00553 (applicants "NOT required

to provide a narrative response in the text box listed below each KSA").  Indeed, narrative

answers on the application were seemingly discouraged.  (*See* note 2 above.)  Peets' resume

provided the narrative necessary to support her answers on the application.  (*See* Doc. 51 Ex. A

at DOT_00613-18.)  That Plaintiff went beyond what was required in the application does not

mean that selecting a candidate who did not was illegitimate.  Additionally, Plaintiff's assertion

that the interview questions were "superfluous" hurts rather than helps him.  (*See* P's Opp. at

22.)  His argument acknowledges that the interview questions were designed to elicit information

on the same topics as the questions in the written application.  The Court does not believe that an

employer that seeks verbal elaboration on matters covered by applications and resumes, or that

regards oral rather than written responses as a better indicator of how an applicant will perform

in a position, is making promotion decisions on illegitimate grounds, and Plaintiff has certainly

not provided any authority to that end.

Accordingly, the Court rejects Plaintiff's arguments suggesting that Defendant's hiring

decision was illegitimate and proceeds to the third step in the *McDonnell Douglas* test.

**B.**     **Whether Defendant's Justification Was Pretext for Discrimination**

Plaintiff argues that there is a fact question as to whether the stated reason for promoting

Restrepo and Peets over him was a pretext for race or age discrimination.  He argues that he has

been provided with inconsistent and shifting reasons as to why he was not promoted, (P's Opp. at

20-22), which, as noted, can under certain circumstances establish pretext.  *See Ethan Allen, Inc.*,

44 F.3d at 120.  Plaintiff states that in January 2014, Malon stated to an EEO investigator that

Plaintiff "was interviewed but did not do as well as the selectee (Sandra Peets)," and that "in the

end, 'her combination of experience, education, and responses to the interview questions were seen as more desirable.'"  (P's Opp. at 20 (quoting Doc. 16 at 51).)  Plaintiff then states that it took "Malon five years to tailor his legitimate non-discriminatory reason down to this bald assertion, 'that he (plaintiff) did not perform as well as Restrepo and Peets when interviewed,'" presumably arguing that the latter statement in the previous sentence creates an inconsistency. (*Id.* at 21.)  But Malon has in fact been consistent since 2014 that Plaintiff did not do as well in the interview as Peets.  (*Id.* at 20; Doc. 16 at 51 (Malon "confirmed [Plaintiff] was interviewed, but did not do as well as the selectee (Sandra Peets).");  Malon Decl. Ex. G at DOT_00511 (in answering the question, "Who was selected?  Why?," Malon provided detailed explanation as to Peets's performance during interview and compared her performance to Plaintiff's.)  Plaintiff cannot credibly state that Malon has been inconsistent or that Plaintiff has not had time to prepare his pretext argument, as Malon has for five years stated that Peets was selected over Plaintiff, at least in large part, due to their interview performances.

Plaintiff next argues that he had "far superior qualifications" than Restrepo and Peets, and thus the selection of them over him suggests that the stated reason for the promotion decision therefore must be a pretext.  (P's Opp. at 13-18.)  Defendant argues that "Plaintiff's credentials were not so superior to those of Peets and Restrepo that no reasonable person could have chosen them over him," and thus "the Court should grant summary judgment for the Government."  (D's Reply at 4.)

The Supreme Court has noted that "qualifications evidence may suffice, at least in some circumstances, to show pretext," even where there is no additional evidence of discriminatory animus, but the Court declined "to define more precisely what standard should govern pretext claims based on superior qualifications."  *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457-58 (2006).

The Second Circuit has held that a plaintiff can establish pretext based on qualifications evidence where the plaintiff's qualifications were "'so superior to the credentials of the person selected for the job that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question.'" *Szewczyk v. Saakian*, 774 F. App'x 37, 40 (2d Cir. 2019) (summary order) (quoting *Byrnie*, 243 F.3d at 103); *see Abraham v. N.Y.C. Dep't of Educ.*, 398 F. App'x 633, 635 (2d Cir. 2010) (summary order) (same); *see also Timothy v. Our Lady of Mercy Med. Ctr.*, 233 F. App'x 17, 21 (2d Cir. 2007) (summary order ("[A]bsent a striking disparity in such credentials, one should be very hesitant to draw any inference from a battle of credentials.").[12] "'Nevertheless, just because the discrepancy between [plaintiff and the successful applicant's] qualifications does not on its own have the strength to create a material issue of fact, that does not mean the discrepancy is stripped of all probative value.'" *Walsh*, 828 F.3d at 78 (alteration in original) (quoting *Byrnie*, 243 F.3d at 103).

Here, it is undisputed that there is no direct evidence of discriminatory animus. Rather, Plaintiff argues that from his "education, experience and training, it is clear that his qualifications are far superior to those of either Peets and Restrepo," and therefore he has shown enough to establish pretext. (P's Opp. at 14.) Specifically, he points to his seven years as an LER

---

[12] Plaintiff suggests that the Second Circuit standard may not be approved by the Supreme Court after *Ash*, and suggests this Court apply standards from other circuits. (*See* P's Opp. at 14.) But the Supreme Court's *Ash* decision did not reject the Second Circuit's standard for qualification evidence, and the Second Circuit has used that standard in numerous cases that both pre- and post-date *Ash*. *See, e.g.*, *Byrnie*, 243 F.3d at 103 (2001 case); *Shands v. Lakeland Cent. Sch. Dist.*, 771 F. App'x 121, 122 (2d Cir. 2019) (summary order), *cert. denied*, 140 S. Ct. 1267 (2020); *see also Walsh*, 828 F.3d at 78 (2016 case citing *Byrnie*'s standard approvingly, though ultimately finding questions of fact prevented summary judgment on pretext). Accordingly, I will not adopt standards articulated by other circuits, as Plaintiff suggests, and in fact I could not do so, as the Second Circuit has clearly established binding precedent on the issue.

Specialist – including "pioneeri[ng] management participation before neutrals at Pre-Arbitration Review (PAR) discussions" – and his leadership experience at the U.S. Marshals Service – including serving as president of "Local 2535" for five years, serving as "the designated management official for Labor and employee Relations," and having "twelve years of management experience" – as making him eminently qualified.  (*Id.* at 15-17.)[13]  Plaintiff also notes that he has a college degree, a law degree, and some additional graduate school, further qualifying him for the job.  (*Id.* at 14.)  Plaintiff argues that, by contrast, Restrepo had received his M.S. only "shortly prior to applying for the Branch Manage[r] position," had been mentored by Plaintiff in mediation and arbitration, had only five years of "Federal civil service" as opposed to Plaintiff's twenty-seven years of the same, and lacked managerial experience that Plaintiff had while working as the U.S. Marshals Service.  (*Id* at 17.)  Plaintiff argues that Peets's six-month managerial experience at the USPS, near-three-year experience as an LER Specialist,[14] and completion of only "some college" make her so much less qualified for the position than Plaintiff that discrimination based on race and age must be the reason she was chosen.  (*Id.* at 14-15.)  I disagree.

First, simply because Plaintiff has more degrees than Peets and different degrees than Restrepo cannot be used to establish his superior credentials for the job in question, as there was

---

[13] Almost none of these facts were laid out in Plaintiff's responsive 56.1 Statement, nor does Plaintiff in his brief cite to portions of the record to establish the truth of such facts.  I would be justified in ignoring them.  But even if Plaintiff did have all of the stated qualifications, the outcome of this motion would remain the same, so the Court assumes the truth of Plaintiff's statement for the purposes of this motion.

[14] Plaintiff erroneously states Peets had only one year and eight months' experience as an LER Specialist, (P's Opp. at 15), but Peets began working in that position in November 2010, (Doc. 51 Ex. A at DOT_00613), and applied for the promotion on July 23, 2013, (*id.* at DOT_00607), which is nearly three years, not less than two.

no degree requirement or even preference for the position. *See Abraham*, 398 F. App'x at 635

("Although [plaintiff] has an engineering degree . . . [,] an engineering background [was not]

among the mandatory or preferred qualifications for the Regional Contract Manager position.").

Further, Restrepo had an advanced degree that Plaintiff did not have, and the Court will not

engage in the exercise of weighing professional degrees against one another.

Next, Plaintiff's description of Restrepo's and Peets's qualifications omits their

considerable attributes. Restrepo spent five years as an operations supervisor at UPS, where he

was responsible for collective bargaining and had a management role; spent seven years in union

roles; and spent a year enforcing labor regulations for the N.Y. Department of Labor, prior to

joining the FAA, where he served as an LER Specialist for more than five years before applying

for the promotion. (D's 56.1 ¶¶ 14, 16-19; Restrepo App. at DOT_00656-59.) Peets had twelve

years of labor-relations experience prior to joining the FAA, including a supervisory position in

which she, among other things, handled grievances, arbitrations, and unemployment hearings

and achieved an over 80 percent win rate in arbitrations, as well as three years as an LER

specialist. (D's 56.1 ¶¶ 23, 26-27.) Thus, while Restrepo and Peets did not have as many jobs or

as many years of work experience as Plaintiff, they both spent many years in labor and employee

relations, as well as many years in the same job as Plaintiff, which at least significantly

undermines any argument that his qualifications were far superior to theirs. Further, the relevant

inquiry is not simply who had the most experience. *See Patel v. City of N.Y.*, 699 F. App'x 67,

69 (2d Cir. 2017) (summary order) ("We have held . . . that greater experience cannot alone

establish that a candidate's qualifications are so superior to another's that the employer's hiring

decision may be found to have been discriminatory."). If it were, many ADEA plaintiffs would

succeed in establishing pretext because they have had more time to work and advance than their

younger counterparts.  In other words, despite the fact that Plaintiff has worked more jobs than

Restrepo and Peets and has spent more time as an LER Specialist, he has not established that

Restrepo and Peets – who had at least comparable experience as Plaintiff in jobs directly dealing

with labor and employment relations – were so much less qualified than Plaintiff for the

promotion that the selection must have been discriminatory.  *See Shah v. MTA N.Y.C. Transit*,

687 F. App'x 32, 34 (2d Cir. 2017) (summary order) (plaintiff failed as matter of law to establish

that his qualifications were so superior to those who were promoted where "[plaintiff] holds a

B.S. and master's degree, [and the promoted individuals] do not hold any college degrees," and

where "[plaintiff] has 25 years of managerial experience, [and the promoted individuals] –

although all qualified for the various positions – had less overall managerial and supervisory

experience"); *Moreno v. Town of Huntington*, 334 F. App'x 426, 428 (2d Cir. 2009) (summary

order) (where candidate selected was "qualified," plaintiff's two additional years' experience at

same employer insufficient to raise inference of discriminatory animus); *see also Kearney v.

County of Rockland ex rel. Vanderhoef*, 185 F. App'x 68, 69-70 (2d Cir. 2006) (summary order)

("That some of the candidates had blemishes on their record or that [plaintiff] feels that the

selection process should have produced a different result does not show the falsity of the

proffered nondiscriminatory reason for the promotion decisions.").  In fact, Plaintiff has not

identified a single case in which a qualified applicant was promoted (or hired), but the court

found that the plaintiff's qualifications were so superior to those of that individual as to establish

pretext for discrimination.

Even if Plaintiff did establish a factual dispute regarding whether his paper application

established that his credentials were far superior to Restrepo's and Peets's, he has ignored how

his performance during the interviews compared to Restrepo's and Peets's.  Plaintiff cannot pick

and choose which aspects of a hiring process are to be considered and which are not, and it is
well settled that employers are allowed to use performance during an interview in making
promotion decisions and in evaluating qualifications among candidates.  *See Moy v. Perez*, 712
F. App'x 38, 42 (2d Cir. 2017) (summary order); *Byrnie*, 243 F.3d at 104 ("[T]here is nothing
unlawful about an employer's basing its hiring decision on subjective criteria, such as the
impression an individual makes during an interview.") (internal quotation marks omitted).  As
noted, after conducting interviews of all six applicants, the three interviewers, each of whom was
over forty-years old at the time and two of whom are white,[15] agreed that Plaintiff performed
worse than Restrepo and Peets, specifically finding that Plaintiff did not have the right customer-
service philosophy and was too negative.  (*See* Malon Decl. ¶ 21 (Plaintiff did not have the
correct customer-service philosophy); McMinn Decl. ¶ 10 (all panelists agreed Peets performed
better than Plaintiff); Rovner Decl. Ex. E at DOT_00524 (Field described Plaintiff focused on
identifying problems but not on providing solutions); Malon Decl. Ex. F (describing Plaintiff's
attitude as "negativ[e]"); McMinn Decl. Ex B at DOT_00531 (describing Plaintiff's tone as
"negative")).  Indeed, Plaintiff admits that during the interview, he stated that at least part of his
leadership style is to "kick ass and to take names," (P's Dep. Tr. at 59:10-17), which naturally
would raise doubts as to his likelihood of meeting the job requirements that he must
"consistently treat others with respect," "handle emotionally charged or controversial issues
responsibly," "build a shared vision with others across the[] organization," "work

---

[15] "While shared membership in a protected class may make a decision-maker less likely
to hold or act on overt animus towards another member of the class, it is not beyond reason that
such a decision-maker might advance a discriminatory agenda." *Fosen v. N.Y. Times*, No. 03-
CV-3785, 2006 WL 2927611, at *5 n.5 (S.D.N.Y. Oct. 11, 2006) (citation omitted).  That said,
that all three of the interviewers were in Plaintiff's class under the ADEA and that two of the
three were in Plaintiff's class under Title VII "provides an additional inference which plaintiff
must overcome." *Drummond v. IPC Int'l, Inc.*, 400 F. Supp. 2d 521, 532 (E.D.N.Y. 2005).

collaboratively," and have the "[a]bility to communicate with peers, subordinates, customers and unions," (Job Announcement at DOT_00552-53).  While Plaintiff disagrees with the weight that the interviewers placed on his customer-service philosophy, and interview in general, the Plaintiff's subjective beliefs about what skills would make a good Branch Manager are irrelevant, as employers "determine what qualifications are necessary." *Abraham*, 398 F. App'x at 635; *see Harding v. Wachovia Capital Markets, LLC*, 541 F. App'x 9, 12-13 (2d Cir. 2013) (summary order) (plaintiff's disagreement with defendants' decision to value certain skills cannot be used to show pretext).  And when framing the employment decision using the qualifications that the employer deemed necessary, Plaintiff has not established that his qualifications were plainly far superior to those of Restrepo and Peets.

"Only where an employer's business decision is so implausible as to call into question its genuineness should th[e] Court conclude that a reasonable trier of fact could find that it is pretextual." *Fleming v. MaxMara USA, Inc.*, 371 F. App'x 115, 118 (2d Cir. 2010) (summary order).  It does not begin to strain credulity that the interviewers would perceive Plaintiff as difficult compared to the "charismatic" Restrepo or "calm" Peets, when considering them for a service-oriented, collaborative position.  The Court does "not sit as a super-personnel department that reexamines an entity's business decisions." *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 169 (2d Cir. 2014) (*per curiam*) (internal quotation marks omitted).  Plaintiff's subjective "disagreement with the way [Defendant] weighed his and [the other applicants'] qualifications does not create an issue of material fact.  An employer has the right to decide how it will value the various qualifications different candidates bring to the table." *Witkowich v. Gonzales*, 541 F. Supp. 2d 572, 582 (S.D.N.Y. 2008) (citation omitted).

Accordingly, Plaintiff has failed to establish pretext through qualification or shifting-explanation evidence, and because he has offered no other argument for pretext, he cannot prevail on his claim for discrimination under Title VII or the ADEA.

## IV.    **CONCLUSION**

For the foregoing reasons, Defendant's motion is GRANTED.  The Clerk of Court is respectfully directed to terminate the pending motion, (Doc. 44), enter judgment for Defendant, and close the case.

**SO ORDERED.**

Dated: July 16, 2020
         White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.

28